**Sandra CARO, Plaintiff,**

v.

**CITY OF DALLAS, et al., Defendants.**

**No. CIV. A. 3:96–CV–3113–G.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 20, 1998.

Donya Cannon Witherspoon, Law Office of Donya Witherspoon, Dallas, TX, for Sandra Caro.

Ann S. Austin, Sangeeta Sharma Kuruppillai, Prema Anjali Velu, Marlene M. Menard, Dallas City Attorney's Office, Dallas, TX, for City of Dallas Texas.

Prema Anjali Velu, Marlene M. Menard, Dallas City Attorney's Office, Dallas, TX, for Bennie NMN Click, Ed Spencer, Randall Jones.

## MEMORANDUM ORDER

FISH, District Judge.

Before the court is the motion for summary judgment of the defendants City of Dallas ("City"), Bennie Click ("Click"), Ed Spencer ("Spencer"), and Randall Jones ("Jones," collectively with the City, Click, and Spencer, "defendants"). For the following reasons, the defendants' motion is granted with respect to the plaintiff's federal claims. The remaining claim—which is based exclusively on state law—is dismissed without prejudice.

## I. BACKGROUND

This case involves allegations of discrimination in employment, deprivation of civil rights, and violations of state law. The plaintiff Sandra Caro ("Caro") seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* the First Amendment to the Constitution of the United States, through 42 U.S.C. § 1983; and the Texas Whistleblower Act, Tex. Gov't Code Ann. § 554.002 (Vernon Supp.1996). *See generally* Plaintiff's Original Complaint ¶¶ 50–63.

The following facts are not in dispute. Caro, an African–American female, joined the Dallas Police Department ("DPD") in September of 1982. Affidavit of Sandra Caro ("Caro Affidavit") at 1, attached as Exhibit 1 to Plaintiff's Brief in Support of Her Response to the Defendants' City of Dallas, Bennie Click, Ed Spencer and Randall Jones Motion for Summary Judgment ("Plaintiff's Brief"). Caro initially served as a patrol officer and was promoted to the rank of sergeant in September of 1989. *Id.* In April of 1991, Caro became the supervisory sergeant in the DPD's Community Services Division (now known as the Community Policing Support Unit ("CPSU" or "Unit")). *Id.;* Oral Deposition of Sandra Caro ("Caro Deposition") at 37, attached to Affidavit of Sangeeta S. Kuruppillai, attached as Exhibit 7 to Defendants City of Dallas, Bennie Click, Ed Spencer and Randall Jones' Motion for Summary Judgment ("Defendants' Motion"). As supervisory sergeant, Caro performed a variety of administrative and managerial tasks within the Unit and supervised the CPSU in the Unit commander's absence. *See* Caro Affidavit at 1–2.

In June of 1992, Raul Rios ("Rios"), an Hispanic male, joined Caro in the CPSU. *Id.* at 2. Rios, also a sergeant, shared supervisory responsibilities with Caro. *Id.* In late 1993, Spencer, a Caucasian male, began as manager of the CPSU. Affidavit of Edwin B. Spencer, Jr. ("Spencer Affidavit") at 2, attached as Exhibit 10 to Defendants' Motion. Shortly thereafter, Jones, a Caucasian male, assumed

the position of CPSU commander. See *id.*; Affidavit of Randall Jones ("Jones Affidavit") at 1, attached as Exhibit 14 to Defendants' Motion. Click charged Spencer and Jones with the task of improving the Unit's productivity. Affidavit of Bennie R. Click ("Click Affidavit") at 2, attached as Exhibit 8 to Defendants' Motion. In carrying out these orders, Spencer and Jones instituted numerous, and often unpopular, new work policies in the CPSU. *Id.; see also* Jones Affidavit at 2–3. Caro and Rios, the supervisory sergeants, reported to Jones, a lieutenant. Click Affidavit at 2. Jones reported directly to Spencer. *Id.*

Caro and Jones clashed almost immediately. Caro Affidavit at 2. Caro claims that Jones exhibited a bias against the female employees of the CPSU and tolerated sexist attitudes among others in the Unit. *Id.* Specifically, Caro alleges that Jones made offensive remarks, undermined her authority, gave her demeaning job assignments, failed to recommend her for awards, and required her to remain after-hours to complete work. See *id.* at 2–5. Jones claims that Caro was argumentative and insubordinate. Jones Affidavit at 2–3. Rios was caught in the middle. See *id.* at 2; Caro Affidavit at 2–3.

Spencer became aware of the conflict between Caro, Rios, and Jones in early 1994. Spencer Affidavit at 3. Spencer attempted to resolve the situation informally, but was unsuccessful. *Id.* On August 1, 1994, Caro filed a formal grievance, claiming sex and race discrimination by Jones. *See generally* Memorandum (Aug. 1, 1994), attached as Exhibit 1 to Defendants' Motion. As required by DPD procedures, Spencer met with Caro shortly thereafter to discuss her grievance. Caro Affidavit at 6; *see also* Memorandum (Aug. 9, 1994), attached as Exhibit 10 to Plaintiff's Response. Spencer, unable to grant the relief requested by Caro at that meeting, then forwarded Caro's grievance to the DPD's Grievance Committee for review. Spencer Affidavit at 3; *see also* Caro Affidavit at 6.

The friction between Caro and Jones continued into the fall of 1994. *See* Caro Affidavit at 6–7; Jones Affidavit at 3–6. On September 13, 1994, the Grievance Committee

recommended a formal Internal Affairs Division ("IAD") investigation into Caro's complaint. Spencer Affidavit at 4. Sergeant Tammy Pamplin–Hughes, an African–American female, was assigned to conduct the investigation. *Id.*

While the IAD conducted its investigation, DPD management continued efforts to resolve the conflict informally. See *id.* at 5. In early October of 1994, Click, the DPD Chief of Police, held a meeting to discuss the charges with Spencer, Caro, and Margaret Chandler ("Chandler"), another CPSU employee who had complained about Jones. *Id.* at 5; Caro Affidavit at 8. In mid-October, Spencer met again with Caro, Rios, and Jones in the hope of resolving the conflict. Spencer Affidavit at 5. Finally, in November of 1994, Spencer suggested that the CPSU management meet with the DPD psychologist to discuss their problems. *Id.* All of these attempts at reconciliation were unavailing. *Id.*

The IAD completed its initial investigation in late October of 1994. *See generally* Memorandum from Tammy Pamplin–Hughes (Oct. 28, 1994) ("Investigation Report"), attached to Affidavit of Lori Mauldin, attached as Exhibit 4 to Defendants' Motion. The IAD determined that the investigation "ha[d] not developed any evidence to prove that Lieutenant Jones discriminated against Sergeant Caro ... on the basis of [her] race or sex." *Id.* at 704. But the IAD also found that "[Jones'] actions could have been perceived as belittling or demeaning," *id.,* and that Jones could have handled some of the incidents better, *id.* at 705. The report concluded by finding that "the Unit has many problems that are due to differences in personalities, management styles, and change." *Id.*

The IAD forwarded the written investigation report to Click on October 28, 1994. See *id.* at 674. Per DPD procedures, the investigation report then circulated through the chain of command, providing an opportunity for comment and additional investigation. *See* Affidavit of Reginald S. Kay ("Kay Affidavit") at 2, attached as Exhibit 9 to Defendants' Motion. Spencer received the investi-

gation report on October 31, 1994. Spencer Affidavit at 4.

In mid-November of 1994, a local television station contacted Caro and other female officers concerning allegations of sex discrimination within the DPD. Caro Affidavit at 8. Caro granted an interview in which she spoke to the station about her grievance against Jones. *Id.* Shortly thereafter, Reginald S. Kay ("Kay"), a lieutenant in the IAD, contacted Caro and instructed her not to speak with the media.[1] *Id.;* Kay Affidavit at 2. Caro indicated that she would speak to reporters if contacted, but she was not contacted and gave no further interviews. *See* Caro Affidavit at 8.

In late November of 1994, Spencer recommended transferring Caro, Jones, and Rios from the Unit. Spencer Affidavit at 6–7. Click concurred with the recommendation. Click Affidavit at 3. Following a review of the DPD's needs and the officers' skills, Caro was transferred to the Communications Department, Jones was transferred to the Central Division, and Rios was transferred to the Intoxilizer Unit. Spencer Affidavit at 7. Each officer was assigned to the evening shift. *Id.* A male sergeant named Phelps, an African-American, replaced Caro in the CPSU. Caro Deposition at 288–89.

On November 30, 1994, Caro filed another grievance with the DPD, claiming that Spencer transferred her in retaliation for speaking to the media. *See* Caro Affidavit at 9. In late August of 1996, the City's Civil Service Board ("Board") met to hear Caro's grievances. *Id.* at 10. The Board concluded that no race or sex discrimination had occurred, but it encouraged the DPD to give Caro priority consideration for future assignments out of concern for the "disproportionate consequences" she had suffered. Letter from David Truly (Sept. 3, 1996) at 1, attached as Exhibit 22 to Plaintiff's Brief.

While her internal grievances were pending, Caro filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *See* Charge of Discrimination ("Charge") at 1, attached as Exhibit 5 to Defendants' Motion. Caro's

EEOC charge alleged that Jones discriminated against her because of her race and sex and that Spencer transferred her in retaliation for filing grievances. *Id.* Caro received a notice of right to sue on her claims in September of 1996 and instituted the present suit roughly two months thereafter. *See generally* Plaintiff's Original Complaint ("Complaint"). The defendants filed the instant motion on October 3, 1997. See Defendants' Motion at 1. Caro has responded, the defendants have replied, and the motion is now ripe for decision.

## II. ANALYSIS

### A. Evidentiary Burdens on Motion for Summary Judgment

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Movants for summary judgment make such a showing by informing the court of the basis of their motion and by identifying the portions of the record which reveal there are no genuine material fact issues to support the nonmovant's case. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The pleadings, depositions, admissions, and affidavits, if any, must demonstrate that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c).

Once the movants make this showing, the nonmovant may not rest on the allegations in her pleadings. *Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 199 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). Rather, she must direct the court's attention to evidence in the record sufficient to estab-

---

1. DPD administrative rules prohibited such contact during the pendency of an internal investigation. Kay Affidavit at 2–3. Caro's investigation was still ongoing. *Id.*

lish that there is a genuine issue of material fact for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. To carry this burden, the "opponent must do more than simply show ... some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmovant must present evidence sufficient to support a resolution of the factual issue in her favor. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505.

While all of the evidence must be viewed in a light most favorable to Caro as the motion's opponent, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Company,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy her summary judgment burden. *Little v. Liquid Air Corporation,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). Summary judgment in favor of the defendants is proper if, after adequate time for discovery, Caro fails to make a showing sufficient to establish the existence of an element essential to her case and as to which she will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### B. *Title VII Claims*

■ Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an ˚employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race ... [or] ... sex." 42 U.S.C. § 2000e–2(a)(1). Title VII also prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter ...." *Id.* § 2000e–3(a). Because Title VII liability ex-

tends only to "employers," any recovery against supervisors, such as Click, Spencer, and Jones, must be against them in their official capacities, not individually. See *Huckabay v. Moore,* 142 F.3d 233, 241 (5th Cir.1998); *Grant v. Lone Star Company,* 21 F.3d 649, 651 (5th Cir.), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *Harvey v. Blake,* 913 F.2d 226, 227–28 (5th Cir.1990).

Despite Caro's voluminous filings, her exact theories of recovery under Title VII remain somewhat unclear. *See, e.g.,* Complaint at 15 (Count One entitled "Race and Sex Discrimination" but factual allegations in ¶ 51 raise only retaliatory transfer). Out of an apparent abundance of caution, the defendants interpret Caro's pleadings as stating claims for race and gender discrimination, sexual harassment, and retaliation. *See* Defendants City of Dallas, Bennie Click, Ed Spencer and Randall Jones' Brief in Support of Defendants' Motion for Summary Judgment ("Defendants' Brief") at 2–6. The court will do likewise and will address each such claim in turn.

### 1. *Race Discrimination*

■ This court applies the burden shifting framework utilized by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to analyze Caro's claims of race discrimination in employment.[2] *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case of race discrimination, Caro must show (1) that she was a member of a protected group, African–American; (2) that she was qualified for her position; (3) that she was dismissed or suffered an adverse em-

---

2. This framework is well known:

"First, the plaintiff must establish a *prima facie* case of discrimination; second, if [s]he is so successful, the defendant must articulate some legitimate, nondiscriminatory reason for the challenged employment action; and third, if the defendant is so successful, the inference of discrimination raised by the *prima facie* case

disappears, and the plaintiff then must prove, by a preponderance of the evidence, both that the defendant's articulated reason is false and that the defendant intentionally discriminated."

*Walton v. Bisco Industries, Inc.,* 119 F.3d 368, 370 (5th Cir.1997).

ployment action;[3] and (4) that the defendants sought to replace her with a similarly qualified white employee. E.g., *Ward v. Bechtel Corporation,* 102 F.3d 199, 202 (5th Cir.1997).

■ Caro cannot make this *prima facie* showing. Although Caro's evidence supports the first three elements of her claim, her own testimony precludes a finding in her favor on the fourth. Caro testified that an African–American officer replaced her in the CPSU and that a second African–American officer later replaced the first. *See* Caro Deposition at 286–292. Thus, no reasonable jury could conclude that the defendants sought to replace Caro with a similarly qualified white employee.[4] Accordingly, summary judgment in favor of the defendants on this claim is appropriate. See *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548 (summary judgment proper when plaintiff fails to provide sufficient proof of an essential element of her case).

### 2. Gender Discrimination

#### a. Disparate Treatment by the City

■ As with the claim of race discrimination, the court applies the *McDonnell Douglas/Burdine/St. Mary's* burden shifting framework to Caro's claim that the City treated her differently because of her sex. *Travis v. Board of Regents of the University of Texas System,* 122 F.3d 259, 263 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998). The *prima facie* elements of this disparate treatment claim resemble those of Caro's claim for race discrimination: (1) that she was a member of a protected group, female; (2) that she was qualified for her position; (3) that she was dismissed or suffered an adverse employment action;[5] and (4) that the defendants sought to replace her with a similarly qualified male employee. E.g., *Ward,* 102 F.3d at 202.

Caro claims that the City treated her differently because of her sex when it transferred her from the Unit. Viewing the summary judgment evidence in the light most favorable to Caro as the nonmovant, the court concludes that Caro has met her *prima facie* burden with regard to the transfer.

■ Having determined that Caro adduced sufficient *prima facie* evidence on her claim of discriminatory transfer, the court must next address the defendants' proffered explanation and Caro's ultimate proof of dis-

3. Under the reasoning of recent sexual harassment decisions of the Supreme Court, this third element may no longer be required. See *Burlington Industries, Inc. v. Ellerth,* —— U.S. ——, ——, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998) (holding that an employer may be liable for sexual harassment by a supervisor, subject to affirmative defense, even though no "tangible employment action" occurred); *Faragher v. City of Boca Raton,* —— U.S. ——, ——, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998) (same); but see *Burlington,* —— U.S. at ——, 118 S.Ct. at 2272 (Thomas, J. dissenting) (liability standards now vary depending on whether sex or race discrimination is alleged).

4. Even if it is assumed, *arguendo,* that Caro has presented a *prima facie* case, her claims would fail for want of evidence from which a reasonable jury could conclude that the legitimate reasons offered by the defendants were pretexts for race discrimination. Caro offers nothing to show that an impermissible racial animus motivated the defendants. Absent such evidence, a verdict in favor of Caro on her claims of race discrimination would be insupportable as a matter of law. See *Swanson v. General Services Administration,* 110 F.3d 1180, 1185 (5th Cir.) (reversing and rendering a jury verdict where the plaintiff offered no evidence connecting defendants' actions to race), *cert. denied,* —— U.S. ——, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997).

5. As noted in relation to Caro's claim of race discrimination, this element may no longer be required in light of *Burlington* and *Faragher.* However, in the opinion of this court, the better reading of these two cases would limit their application to claims involving a hostile work environment. Title VII prohibits discrimination in "compensation, terms, conditions, or privileges of employment." *See* 42 U.S.C. § 2000e–2(a)(1). Unlawful harassment may easily become so severe or pervasive that it alters the conditions of employment though no tangible employment action has occurred. See, e.g., *Faragher,* —— U.S. at ——, 118 S.Ct. at 2283; *Oncale v. Sundowner Offshore Services, Incorporated,* 523 U.S. ——, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 22–23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66–67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). But when a plaintiff complains of a discrete instance of unlawful treatment, logic dictates that the plaintiff articulate and prove how her compensation, terms, or privileges of employment were tangibly affected.

crimination. The defendants explain that the City transferred the CPSU supervisors because personality conflicts inhibited the efficient management of the Unit. Defendant's Brief at 3. Caro does not challenge the proposition that personality conflicts provide a legitimate reason for the transfers, *see* Plaintiff's Brief at 2, 6; instead, she contends that the defendants' reliance on the conflict is a pretext for discrimination. *Id.* As proof, Caro repeatedly offers her subjective belief that she was transferred because she was female. *Id.* at 2–11. In addition, Caro points to the treatment of a male subordinate, Senior Corporal Benny Barrett, who was the subject of complaints but who did not receive a transfer. *Id.* at 2. Finally, Caro alleges that Jones and Rios received better assignments and more favorable treatment following the transfer. *Id.* at 2–5. The defendants insist that Caro's evidence fails to raise an issue of material fact for trial. Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment and Brief in Support Thereof at 4–7.

The court agrees with the defendants. First, the Fifth Circuit has repeatedly held that an employee's subjective belief that she was the victim of discrimination does not create an issue of material fact for trial. See, e.g., *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir.1997) ("To establish pretext, a plaintiff cannot merely rely on [her] subjective belief that discrimination has occurred ...."); *Southard v. Texas Board of Criminal Justice*, 114 F.3d 539,

555 (5th Cir.1997) (a plaintiff's "subjective interpretation of [her supervisor's] comments is insufficient to raise a fact issue as to sexual harassment."); *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1430 (5th Cir.1996) (en banc) ("It is more than well-settled that an employee's subjective belief that [s]he suffered an adverse employment action as a result of discrimination, without more, is not enough to survive a summary judgment motion ...."); *Ray v. Tandem Computers, Inc.*, 63 F.3d 429, 434 (5th Cir.1995) ("[The plaintiff's] subjective belief that discriminatory intent motivated these actions is insufficient to establish a material question of fact regarding [the defendant's] motives"). Second, in a disparate treatment case, the court compares the plaintiff only to those who are similarly situated. E.g., *Smith v. Wal–Mart Stores (No. 471)*, 891 F.2d 1177, 1180 (5th Cir.1990). Here, the male employee to whom Caro refers was not one of the Unit's managers. As a subordinate, this employee was not similarly situated to Caro or the other Unit supervisors. Therefore, the defendants' treatment of him is irrelevant. See, e.g., *Walton*, 119 F.3d at 373 ("It is not discrimination to treat differently situated persons differently."). Finally, Caro offers absolutely no evidence from which a reasonable jury could conclude that the City transferred her to a less favorable assignment because of her sex.[6] Rather, the summary judgment evidence shows that the male CPSU supervisors also received transfers[7] and that the

---

**6.** The court will not address Caro's allegation that the defendants treated her unfavorably following the transfer. Caro did not raise this allegation, effectively a claim for failure to promote, in her EEOC charge and omitted it from the causes of action in her complaint. *See* Charge of Discrimination at 1; Complaint at 15–18. First, this claim is not sufficiently "like or related" to the allegations in Caro's charge to permit its maintenance despite her failure to exhaust administrative remedies. See *Fine v. GAF Chemical Corporation*, 995 F.2d 576, 577–78 (5th Cir.1993); cf. *Hirras v. National Railroad Passenger Corporation*, 95 F.3d 396, 398 n. 3 (5th Cir.1996) (plaintiff may not base Title VII complaint on alleged comments omitted from EEOC charge). Second, Caro's complaint fails to provide sufficient notice to the defendants of her intent to rely on this claim as a grounds for recovery, and thus, this claim is not properly before the court. See, e.g., *Beanal v. Freeport–*

*McMoRan, Inc.*, 969 F.Supp. 362, 367 (E.D.La. 1997) (plaintiff cannot amend complaint by briefs submitted in opposition to later motions).

**7.** Caro's deposition testimony regarding an exchange between her, Spencer, and Rios is typical of the evidence presented on the issue of alleged disparate treatment on the basis of sex:

> Q. Is that—during that meeting [between Spencer, Caro, and Rios on November 28, 1994], is that when you were also told that you were going to be assigned to Communications or is that something you learned later?
> A. No, it was during that meeting. After he informed me that he had made a decision—or after he informed both Sergeant Rios and I that he had made a decision to transfer—he said Randy. That was his word, quote/unquote, Randy to Central—and I was surprised to hear that, once again based on our Novem-

Communications Department held the only available position for which Caro was eligible and qualified.[8] *See* Spencer Affidavit at 7. In short, Caro provides nothing from which a reasonable jury could conclude that the transfer was an action taken by the City against Caro because of her sex, rather than an attempt by the City to deal with three supervisors who simply could not get along. Accordingly, summary judgment in favor of the defendants is appropriate on Caro's claim of disparate treatment because of her sex. See *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548.

### b. *Sexual Harassment by Jones*

In addition to outlawing discrete acts of gender of discrimination, Title VII provides a cause of action to individuals placed in a sexually hostile or abusive work environment. E.g., *Meritor*, 477 U.S. at 66–67, 106 S.Ct. 2399. Caro claims that Jones created such an environment in the CPSU and seeks to impute liability for Jones' alleged harassment to their employer, the City.

 The Supreme Court recently clarified the scope of employer liability for claims such as these. See generally *Burlington*, —— U.S. ——, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Faragher*, —— U.S. ——, 118 S.Ct. 2275, 141 L.Ed.2d 662. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."

*Burlington*, —— U.S. at ——, 118 S.Ct. at 2270; *Faragher*, —— U.S. at ——, 118 S.Ct. at 2292–93. To be actionable, the hostile environment must affect the "terms, conditions, or privileges" of the victim's employment. *Oncale*, 523 U.S. at ——, 118 S.Ct. at 1001; *Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399. When a victimized employee suffers a "tangible employment action"[9] at the hands of a harasser, that action alone constitutes a sufficient change in the victim's employment. *Burlington*, —— U.S. at ——, 118 S.Ct. at 2265. In such cases, the employer is strictly liable. See *id.* —— U.S. at ——, 118 S.Ct. at 2269. If the alleged victim has not suffered a tangible harm, the sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment."' *Meritor*, 477 U.S. at 67, 106 S.Ct. 2399 (quoting *Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir.1982); accord *Burlington*, —— U.S. at ——, 118 S.Ct. at 2264–65; *Faragher*, —— U.S. at ——, 118 S.Ct. at 2283; *Oncale*, 523 U.S. at ——, 118 S.Ct. at 1001; *Harris*, 510 U.S. at 21, 114 S.Ct. 367). In these cases, the employer may raise an affirmative defense to liability by showing:

(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or

---

ber 21st discussion with Margaret [Chandler] and I.

And then he went on to say that "I've made more decisions. Sandra, I'm transferring you to Communications. And, Rios, you're going to the jail because Chief Vasquez requested you." That was his words.

\* \* \* \* \* \*

I went on to ask him, "Why am I being transferred?" And he—his statement was, "For the betterment of the department."

\* \* \* \* \* \*

[A]fter asking him once again why I was being transferred, I think Sergeant Rios interrupted and said, "Well, I want to know why I'm being transferred," and he said, "I haven't done anything wrong." And Ed's response was, "Well, Sandra hasn't done anything wrong either, but she's being transferred."

Caro Deposition at 259–260.

**8.** Caro, a sergeant, was ineligible for the lieutenant opening in the Central Division, and she did

not speak Spanish, a requirement for the position in the Intoxilizer Unit. *See* Spencer Affidavit at 7.

**9.** This Supreme Court term appears to be the functional equivalent of the Fifth Circuit's terms, "ultimate employment decision" and "adverse employment action." Compare *Burlington*, —— U.S. at ——, 118 S.Ct. at 2268 ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.") with *Mattern v. Eastman Kodak Company*, 104 F.3d 702, 707 (5th Cir.) ("Ultimate employment decisions including acts such as hiring, granting leave, discharging, promoting, and compensating.") (internal quotation marks omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997).

corrective opportunities provided by the employer or to avoid harm otherwise.

*Burlington,* —— U.S. at ——, 118 S.Ct. at 2270; *Faragher,* —— U.S. at ——, 118 S.Ct. at 2293.

■ In the present case, Caro alleges that Jones exhibited a bias against the female employees of the Unit. Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response") at 4. As examples of Jones' bias, Caro relates various incidents in which Jones insulted female employees, criticized female employees, failed to commend female employees, assigned menial work to female employees, and questioned female employees about their decisions to take vacation or sick leave. *Id.* at 5–12. Such actions do not constitute "tangible employment actions," as that term has been used in construing Title VII. See *Webb v. Cardiothoracic Surgery Associates of North Texas, P.A.,* 139 F.3d 532, 540 (5th Cir.1998) (rudeness and incivility not "employment action"); *Bennett v. Total Minatome Corporation,* 138 F.3d 1053, 1060 n. 10 (5th Cir.1998) (undesirable work assignment not "ultimate employment decision"); *Southard,* 114 F.3d at 555 (undesirable work assignment not "employment action"); *Mattern v. Eastman Kodak,* 104 F.3d 702, 707 (5th Cir.) (hostility, reprimands, and increased supervision not "ultimate employment decision"), *cert. denied,* —— U.S. ——, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997); *Dollis v. Rubin,* 77 F.3d 777, 781 (5th Cir.1995) (refusal to perform desk audit not "ultimate employment decision"). Thus, the present case falls into the second category of claims: those in which the employee did not suffer a tangible employment action at the hands of the alleged harasser.[10]

■ Title VII is not a general civility code. See *Faragher,* —— U.S. at ——, 118 S.Ct. at 2283–84; *Oncale,* 523 U.S. at ——, 118 S.Ct. at 1002. To be actionable, workplace harassment must be both subjectively

and objectively hostile and abusive. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. In making this determination, the court looks to the totality of the circumstances, considering, *inter alia,* "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. Conduct which is merely offensive is not actionable. See *id.* at 21. Rather, the Supreme Court has been clear that the conduct must be "extreme" before it will create an objective change in the terms and conditions of employment. *Faragher,* —— U.S. at ——, 118 S.Ct. at 2284. This requirement is specifically intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)).

This case involves just such a complaint. Jones never had sex with Caro, cf. *Meritor,* 477 U.S. at 60, 106 S.Ct. 2399; he never propositioned her for sex, cf. *Burlington,* —— U.S. at ——, 118 S.Ct. at 2262; *Harris,* 510 U.S. at 19, 114 S.Ct. 367; he never threatened her with rape, cf. *Oncale,* 523 U.S. at ——, 118 S.Ct. at 1001; he never touched or fondled her, cf. *Faragher,* —— U.S. at ——, 118 S.Ct. at 2281, 141 L.Ed.2d 662, he never commented on her sex life, cf. *Farpella–Crosby v. Horizon Health Care,* 97 F.3d 803, 805 (5th Cir.1996); *Nash,* 9 F.3d at 403; and he never promoted a sexually charged environment, cf. *Waltman v. International Paper Co.,* 875 F.2d 468, 470–71 (5th Cir.1989). Rather, at the core of Caro's complaints are Jones' poor management skills and demeanor.

The evidence, when viewed in the light most favorable to Caro, shows that Jones was gruff and abrasive toward her, but this is not a violation of Title VII. See *McConathy v. Dr. Pepper/Seven Up Corporation,* 131

---

**10.** Although Caro was transferred from the CPSU, a tangible employment action, this action was taken by the City, not the alleged harasser. Moreover, the evidence on file shows that the City took this action to protect the function of the Unit and to protect the managers from each other. See *supra* Section II.B.2.a. Such transfers are permitted. See, e.g., *Nash v. Electrospace System, Inc.,* 9 F.3d 401, 404 (5th Cir.1993) (employer may transfer employee to insulate her from contact with alleged harasser).

F.3d 558, 564 (5th Cir.1998) ("It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or "colder-shouldering" to the level of an actionable offense."). Jones made the Unit an unpleasant place for Caro to work, but no reasonable jury could conclude that his behavior was so extreme that it altered the conditions of Caro's employment. Cf. *id.* (repeated insults, berating, and lack of support not actionable as a matter of law). Moreover, Caro had recourse through the grievance, IAD, and City Civil Service Board procedures. Far from being a helpless, hapless victim, Caro was fully empowered by her employer's anti-discrimination policies; she knew them; she used them.[11] This support system mitigates the objective hostility of the environment Jones created. See *DeAngelis v. El Paso Municipal Police Officers Association,* 51 F.3d 591, 596 (5th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995). Thus, assuming, *arguendo,* that Jones' actions were motivated by Caro's sex, the court concludes that those actions, as a matter of law, did not violate Title VII.[12] Cf. *Southard,* 114 F.3d at 555 (stares, threats, and unreasonable work assignments not actionable); *Weller v. Citation Oil & Gas Corporation,* 84 F.3d 191, 194 (5th Cir.1996) (retributive epithet not actionable), *cert. denied,* — U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 607 (1997); *DeAngelis,* 51 F.3d at 597 (printed derogatory references not actionable).

### 3. *Retaliation*

As with Caro's claims of discrete instances of race and gender discrimination, the court applies the *McDonnell Douglas/Burdine/St. Mary's* burden shifting framework to Caro's claims of retaliation. See *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1121–22 (5th Cir.1998); *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir.1996). Caro claims that the defendants transferred her in retaliation for her complaints of discrimination and harassment in the CPSU. Complaint ¶ 51. The defendants do not contest Caro's *prima facie* case but insist that Caro was transferred for the legitimate reasons discussed above. See Defendants' Brief at 3. Similarly, Caro relies on the proof she offered in support of her claim of discriminatory transfer to support her claim of retaliation. See Plaintiff's Brief at 2–11.

 Upon review of the evidence, the court concludes that Caro has failed to provide proof from which a reasonable jury could find that retaliation was the cause-in-fact[13] of her transfer. First, the summary judgment evidence shows that Chandler, another employee who had filed a grievance, did not receive a transfer while Jones and Rios, who had not filed grievances, did. Second, although Caro's complaints and the transfer were closely related in time, proximity in time is insufficient by itself to create an issue of material fact regarding pretext. See *Swanson,* 110 F.3d at 1188 ("[O]nce the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some

---

**11.** The summary judgment evidence conclusively establishes that the City promptly and reasonably responded to Caro's complaints. The DPD's Grievance Committee, the IAD, and the City's Civil Service Board each investigated Caro's allegations, and each found no evidence of unlawful discrimination. Caro does not even allege, much less provide evidence, that these investigations were somehow tainted. In addition to the formal investigations, Click and Spencer met with Caro, Jones, and others on numerous occasions in attempts to remedy the situation in the CPSU. When all else failed, the City removed the contentious supervisors from the Unit and from each other's presence.

**12.** Because the court concludes, as a matter of law, that Caro was not victimized by a hostile work environment, the City's affirmative defense

need not be addressed. The court notes that had Jones' actions been sufficiently offensive, however, this case might well have produced the quixotic result predicted by Justice Thomas in his dissent to *Burlington,* — U.S. at ——, 118 S.Ct. at 2274 ("Moreover, employers will be liable notwithstanding the affirmative defense, even though they acted reasonably, so long as the plaintiff in question fulfilled her duty of reasonable care to avoid harm.").

**13.** The "cause-in-fact" analysis of pretext requires proof of a significantly stronger relationship between the adverse employment action and the alleged retaliation than is required to show a "causal link" for the plaintiff's *prima facie* case. *Sherrod,* 132 F.3d at 1122 n. 8; *Long,* 88 F.3d at 305 n. 4.

evidence from which the jury may infer that retaliation was the real motive.") Caro has failed rebut the defendants' explanation with independent evidence of pretext. Thus, summary judgment is appropriate. See *Sherrod,* 132 F.3d at 1123; *Swanson,* 110 F.3d at 1188; cf. *Nash,* 9 F.3d at 404 ("The fact of [the plaintiff's] transfer represents not retaliation, but an act that insulated her from further contact with [the accused harasser].").

## C. 42 U.S.C. § 1983—Civil Rights Violations

Next, Caro claims that the defendants transferred her in retaliation for granting the television interview. Complaint ¶ 53. Caro insists that the First Amendment protected her interview because the interview involved a matter of public concern. Plaintiff's Brief at 11. First, she asserts that the public has a right to know about gender bias in the DPD because the DPD performs a public service affecting female citizens. *Id.* at 11–12. Second, Caro argues that discrimination within the DPD is of public concern because taxpayers fund DPD operations. *Id.* at 12. Third, she states that prospective applicants to the DPD within the general population have a right to know of discrimination in the DPD. *Id.* Finally, Caro claims that public discussion of such issues encourages internal changes in DPD policy. *Id.* In support of her claims, Caro refers the court to a recent case from the Fifth Circuit Court of Appeals, *Forsyth v. City of Dallas,* 91 F.3d 769 (5th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). *See* Plaintiff's Brief at 14.

Caro paints the public interest with far too broad a brush. Caro's arguments, if accepted, would protect any speech by any employee of any public agency, as all public agencies perform public functions, receive taxpayer support, have prospective applicants in the general populace, and are subject to public pressures. This is clearly not the law. See, e.g., *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

■■■■ To assert a § 1983 claim for retaliation for the exercise of a federally protected right, a public employee must show that she: (1) engaged in a protected activity; (2) an adverse employment action followed; and (3) there was a causal connection between the activity and the adverse action. *Southard,* 114 F.3d at 554. Not all speech is protected speech. The Fifth Circuit applies a three part test to determine if the speech of a public employee is protected by the Constitution. "First, the speech must involve a matter of public concern. Second, the public employee's interest in commenting on matters of public concern must outweigh the public employer's interest in promoting efficiency. Third, the employee's speech must have motivated the [adverse employment decision]." *Denton v. Morgan,* 136 F.3d 1038, 1042 n. 2 (5th Cir.1998); accord *Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1050 (5th Cir.1996). The question of whether given speech is entitled to First Amendment protection presents an issue of law for the court. *Click v. Copeland,* 970 F.2d 106, 111 (5th Cir.1992); see also *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684.

### 1. Public or Private Concern

■■■■ Whether speech is of public or private concern depends on the circumstances of its utterance. *Denton,* 136 F.3d at 1043; *Wallace,* 80 F.3d at 1050. "In determining whether speech is of public concern, we must determine if [the plaintiff's] speech was 'primarily in [her] role as citizen or primarily in [her] role as employee.'" *Wallace,* 80 F.3d at 1050 (quoting *Terrell v. University of Texas Sys. Police,* 792 F.2d 1360, 1362 (5th Cir.1986), *cert. denied,* 479 U.S. 1064, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987)); accord *Denton,* 136 F.3d at 1042. If a plaintiff speaks primarily in her role as employee, the speech is of public concern only if it involves the report of corruption or wrongdoing to higher authorities. *Wallace,* 80 F.3d at 1051. If the matter is not of public concern, "'government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.'" *Denton,* 136 F.3d at 1043 (quoting *Connick,* 461 U.S. at 146, 103 S.Ct. 1684).

■■■■ In the present case, the defendants insist that Caro spoke to the television sta-

tion primarily in her role as an employee of the DPD. Defendant's Brief at 9. Though Caro maintains that her statements were of public concern, she does not contest the defendants' assertion. *See* Plaintiff's Brief at 11–15. Upon review of the taped interview, the court agrees with the defendants. In the interview, Caro appears in her uniform, answers questions as "a Dallas police officer," and relates her specific grievance. *See generally* Videotape, attached as Exhibit 27 to Plaintiff's Response. Caro clearly spoke as an employee of the DPD.

But this does not end the inquiry; the court must still determine if Caro satisfies the "whistleblower" exception recognized by the Fifth Circuit Court of Appeals and applied in *Forsyth.* In *Forsyth,* the Fifth Circuit faced cross-appeals in a suit by DPD officers against their superiors and the City. *Forsyth,* 91 F.3d at 772. The officers alleged that they received unwanted transfers in retaliation for speaking to a local newspaper about illegal wiretapping conducted by several high-ranking DPD officials. *Id.* 91 F.3d at 772–73. The defendants asserted, among other things, that the district court erred in finding that the plaintiffs engaged in conduct protected by the First Amendment. *Id.* 91 F.3d at 773. The Fifth Circuit affirmed the judgment of the district court, finding that the plaintiffs were primarily motivated by public · concerns in publicizing their allegations. *Id.* 91 F.3d at 773–74.

Caro claims that *Forsyth* governs this case. Plaintiff's Brief at 14. The court disagrees. Although this case bears a passing resemblance to *Forsyth*—both involve statements to the media by police officers who were subsequently transferred—the circumstances surrounding Caro's statements vary materially from those in *Forsyth.* Most significantly, the statements in *Forsyth* involved allegations of public corruption and undue influence at the highest levels of the DPD, see *Forsyth,* 91 F.3d at 773–74, while Caro's statements related to an employment dispute

and grievance against a single middle-manager. Thus, Caro's statements, reflecting one employee's dissatisfaction with the actions of her superior, did not involve the kind of official misconduct of concern to the general public.[14] See *Connick,* 461 U.S. at 149, 103 S.Ct. 1684 ("[T]he First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.").

### 2. *Public Efficiency*

■ In balancing an employee's interests against those of a public employer, the court may consider:

> (1) the degree to which the employee's activity involved a matter of public concern; (2) the time, place, and manner of the employee's activity; (3) whether close working relationships are essential to fulfilling the employee's public responsibilities and the potential effect of the employee's activity on those relationships; (4) whether the employee's activity may be characterized as hostile, abusive, or insubordinate; (5) whether the activity impairs discipline by superiors or harmony among coworkers.

*Brady v. Fort Bend County,* 145 F.3d 691, 707 (5th Cir.1998); see also *Brawner v. City of Richardson, Texas,* 855 F.2d 187, 192 (5th Cir.1988). Here, these factors weigh heavily in favor of a conclusion that Caro's interest in publicly commenting on her grievance did not outweigh the DPD's interest in efficiently managing departmental affairs.

First, the public interest in learning the details of Caro's employment dispute is minimal at best and its constitutional weight is diminished further by the public's ability to obtain the same information by other means without violating DPD policy, *e.g.,* through a Freedom of ·Information Act request. Second, Caro's interview hastened the deterioration of the working relationship between the Unit's supervisors. Third, Caro's actions were grossly insubordinate; it is undisputed

---

**14.** This, of course, is not to say that the First Amendment offers no protection for the reporting of sexual harassment or other discrimination. It clearly does. See, e.g., *Wilson v. UT Health Center,* 973 F.2d 1263, 1269 (5th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). *But the Fifth Circuit has* recognized that this protection is generally limited to reports made to superiors or to the appropriate government agency. See *Denton,* 136 F.3d at 1043; *Wallace,* 80 F.3d at 1051.

that DPD policy prohibited employees from commenting on matters subject to an internal investigation during the pendency of that investigation. Finally, Caro's interview exacerbated existing discipline problems within the Unit, impeding its efficient operations. In short, the DPD had good reason to suppress Caro's comments and minimal, if any, public good resulted from their release. Thus, the First Amendment did not protect Caro's interview. See *Connick*, 461 U.S. at 153–54, 103 S.Ct. 1684; cf. *Brady*, 145 F.3d at 708 (holding that 1st Amendment protected political activities of deputy sheriffs because of great public interest and minimal adverse impact).

### 3. *Causation*

Finally, even if Caro's speech were of public concern and the balance of interests did weigh in her favor, she has failed to provide evidence that the defendants transferred her in retaliation for giving the interview. Rather, Caro would have the court infer wrongdoing from the fact that she received a transfer subsequent to speaking out. Similar to Caro's other claims of retaliation, the evidence in the record does not support a causal link sufficient to impart liability. Spencer dealt with other employees in the CPSU without regard for whether they gave interviews; Chandler, whom the television station interviewed, remained in the Unit while Rios, whom the television station did not interview, received a transfer. In addition, the rapid deterioration of the CPSU supervisors' working relationship adequately explains Spencer's timing in ordering the transfers. Accordingly, summary judgment in favor of the defendants is appropriate.

### D. *Texas Whistleblower Act*

Federal court jurisdiction exists over an entire action, including state law claims, when the federal and state law claims " 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.' " *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). Yet a federal court's exercise of jurisdiction over state law claims is a "doctrine of discretion, not of plaintiff's right." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130. Consequently, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims." *Carnegie–Mellon*, 484 U.S. at 350, 108 S.Ct. 614.

When the federal claims are dismissed before trial and only state law claims remain, the balance of factors to be considered under the supplemental jurisdiction doctrine weigh heavily in favor of declining jurisdiction; therefore, the federal court should usually decline the exercise of jurisdiction over the remaining claims. *Id.* at n. 7. According to the Fifth Circuit, "[o]ur general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed." *Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir.1992) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir.1989)).

In the instant case, the defendants are entitled to judgment on Caro's federal claims, leaving only a state law claim. Because the federal claims are being adjudicated before trial, the factors of judicial economy, convenience, fairness, and comity suggest that this court ought to decline jurisdiction over the remaining claim. *See* 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION

For the reasons stated, the defendants' motion for summary judgment is **GRANTED** with respect to Caro's federal claims. Caro's remaining claim—which is based exclusively on state law—is, in the exercise of the court's discretion, **DISMISSED** without prejudice.

**SO ORDERED.**